RENDERED: JUNE 16, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0569-TG
2020-SC-0571-TG

FRED DEVON FRIEDMANN, INDIVIDUALLY          APPELLANTS
AND AS A MEMBER OF THE TAX RECALL
PETITION COMMITTEE; CAROLE
BRETSCHNEIDER, INDIVIDUALLY
AND AS A MEMBER OF THE TAX RECALL
PETITION COMMITTEE; LINDA LENOE
HARRETT, INDIVIDUALLY
AND AS A MEMBER OF THE TAX RECALL
PETITION COMMITTEE;
CHERI NELSON MISNER, INDIVIDUALLY
AND AS A MEMBER OF THE TAX RECALL
PETITION COMMITTEE; MICHAEL
JEROME SCHNEIDER, INDIVIDUALLY
AND AS A MEMBER OF THE TAX RECALL
PETITION COMMITTEE

AND

HONORABLE BOBBIE HOLSCLAW, IN HER
OFFICIAL CAPACITY AS JEFFERSON
COUNTY CLERK

             ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                 HONORABLE BRIAN C. EDWARDS, JUDGE
                   NO. 20-CI-004856

JEFFERSON COUNTY BOARD OF          APPELLEES
EDUCATION

AND

JEFFERSON COUNTY TEACHERS
ASSOCIATION

**OPINION OF THE COURT BY JUSTICE CONLEY**

**AFFIRMING**

This case is before the Court on appeal from the Jefferson Circuit Court's ruling prohibiting a vote tabulation regarding a school board tax recall based upon alleged violations of KRS[1] 132.017 and KRS Chapter 369. Additionally, the circuit court dismissed the counterclaim against Appellee, Jefferson County Board of Education (JCBE), concluding the JCBE did not violate KRS 133.185 or KRS 160.470(7) by providing notice of the impending tax increase. For the following reasons, the circuit court's judgment is affirmed.

## I. Facts and Procedural Posture

In 2018, the JCBE adopted a corrective action plan at the behest of the Kentucky Board of Education, arising from a determination by the latter that Jefferson County schools were inadequately funded. The Board of Education threatened a "takeover" of the schools if the JCBE did not address the lack of funding. A task force was commissioned to make recommendations and, following at least one of those recommendations, the JCBE adopted a tax increase from 73 to 80.6 cents per $100 of assessed real and personal property. This tax was adopted on May 21, 2020.

Pursuant to statute though, this tax could not immediately go into effect. Instead, since a portion of the tax increase would exceed "more than four percent (4%) over the amount of revenue produced by the compensating tax

---

[1] Kentucky Revised Statutes.

rate[,]" that excess portion was subject to a recall petition.[2] A group of citizens did undertake to challenge the excess portion, forming the Tax Recall Petition Committee (Recall Committee). If the Recall Committee could attain a threshold number of signatures on a petition challenging the excess portion of the tax,[3] then a question to revoke the excess portion could be placed on the ballot and presented to the relevant portion of the voting public.[4] The Recall Committee filed an affidavit with the Jefferson County Clerk, Bobbie Holsclaw (County Clerk), on May 22, 2020. Its official members included five residents of the taxing jurisdictions of Jefferson County Public Schools. Its driving force though was Theresa Camoriano, who was listed as attorney for the Recall Committee, but who was not a resident of any affected tax jurisdiction and not a committee member.[5]

Camoriano described herself as the instigator and spearhead of the Recall Committee, testifying by deposition that "things had to be done, and I was instrumental in either doing them or helping get them done, [or] finding people to do them, that sort of thing." She was also the face of the Recall

---

[2] KRS 160.470(8)(a). The compensating tax rate is defined as

> that rate which, rounded to the next higher one-tenth of one cent ($0.001) per one hundred dollars ($100) of assessed value and applied to the current year's assessment of the property subject to taxation by a taxing district, excluding new property and personal property, produces an amount of revenue approximately equal to that produced in the preceding year from real property.

KRS 132.010(6).
[3] KRS 132.017(2)(d)(6)(a)
[4] KRS 132.017(2)(g).
[5] She did testify to owning a rental company that owns property in an affected district.

Committee, conducting most of its public relations either through social media, holding a press conference, answering questions from journalists, or doing radio interviews. It was she who decided ultimately to submit the petition and its signatures to the County Clerk in a physical, paper format rather than electronically, despite the vast majority of signatures collected being submitted electronically. Finally, she and her daughters took upon themselves the task of sorting through the signatures to discover duplicates.

The decision to use electronic signatures resulted in the Recall Committee creating a petition page on its website, NoJCPStaxhike.com. Michael Schneider, a committee member, was tasked with creating the website though he did not create the petition page.[6] The website was set up using a company called HostGator for server space. There were only two basic security features, CodeGuard and SSH. CodeGuard provided monitoring services to alert Schneider should a third-party attempt to hack the website on the administrative side. SSH, or secure shell home page, encrypted the communication between users and the website. In other words, whenever a person visited the website and entered their information on the petition, SSH encrypted that communication as it was being conveyed across the internet to the website.

---

[6] Schneider, along with Camoriano, was designated by the Recall Committee as its authorized representative to testify on its behalf, so although his immediate responsibility was the website, his deposition testimony spanned numerous other issues.

The petition page was created by Sarah Durand. Per Schneider, Durand was directed by Camoriano as to what information should be required for signing the petition. This included name, birth date, address, and email address. Schneider stated a decision was made between he and Camoriano to not request social security numbers because of a belief people would be reluctant to give that information. Finally, Schneider testified that he would daily aggregate the petition signatures from the website and send them to Camoriano for evaluation in an Excel spreadsheet. He conceded there were no procedures given to Camoriano by the Recall Committee to evaluate signatures, that Carmoriano was just expected to use good judgment, and that Camoriano could edit the Excel spreadsheets after he sent them to her.

Per Camoriano, her evaluation of signatures was mainly to eliminate duplicates. The elimination process amounted to organizing spreadsheets by name and eliminating duplicates of names, addresses and birth dates. She testified to eliminating at least 7,000 duplicates this way. Additionally, she testified she and her daughters went through each signature that lacked a precinct number in order to provide a precinct number for that signature.[7] Using LOJIC[8] the three would alter street addresses in order to correlate an

---

[7] KRS 132.017(2)(d)(5) requires "[e]ach electronic and nonelectronic petition signature shall be followed by the printed name, street address, Social Security number, or birth month, and the name and number of the designated voting precinct of the person signing[.]"

[8] LOJIC is an information consortium serving Louisville and Jefferson County to maintain a geographic information system.

address with its precinct number, e.g., abbreviating "street" to "st" or "drive" to "dr".

Camoriano also testified to accessing the state Republican party database to verify signatures. She conceded this database contained all the information required to be filled in by a signatory on the petition. Using this database, she testified to verifying signatures by street addresses. Although adamant she could not recall doing so, she did concede to a possibility of her altering addresses if a name and birth date were otherwise matched. She also conceded to altering at least 3,000 birth dates but insisting these were merely formatting edits and not substantive alterations. Nonetheless, she conceded to making "fewer than a couple hundred" entries where a birth date had been omitted by a purported signatory and, after checking with the Republican database, filling in their birth date. Indeed, Camoriano stated that she intended "to make sure that a person who signed wanted their signature to count . . . ." and upon that basis flatly admitted to making substantive alterations by filling in omitted information:

> Well, we – well, we would have – we would have made sure that we had more than one data point. Like if I only had a name, no way was I going to add everything else, you know, I wouldn't have taken a bare name and added the rest of the data. I would have had to have had a number of pieces of information for that person to add any data for that person, and it would have had to match up with the – with the database that I saw, you know, with the entry that I saw.

Camoriano then testified that no purported signatory had ever given her permission to alter or correct their signature nor did she ever seek such permission from any individual. Instead, she presumed she had an implied

6

permission. She stated the Recall Committee never specifically authorized her alterations or corrections—instead referring to an amorphous expectation of good judgment—and that she never conducted any legal research as to whether she had legal authority to make these alterations or signatures.

As for handwritten signatures, Camoriano admitted she would add "second addresses or something that we found . . ." but insisted she never deleted or "change[d] what the person had put on the – on their record." Immediately after stating this, however, she conceded an omitted birth date may have been added on some signatures. Camoriano then admitted to inserting surrogate signatures electronically, where people had contacted her requesting their names be put on the petition, and sometimes having to add information that they failed to give her. She again insisted these were only a handful and provided documentation of the requests. Finally, she conceded the County Clerk would have had no way to determine which signatures were altered by her and her daughters due to her submitting the electronic signatures in a paper format and refusing to hand over the underlying electronic data despite a request to do so by the County Clerk.

The County Clerk had requested the electronic data because the Recall Committee had, on July 10, 2020, submitted 40,320 signatures for certification on 1,149 pages of paper. The electronic data would have undoubtedly simplified review. Forced to undergo a physical evaluation of these signatures, the County Clerk assigned twenty of her deputies to review apportioned sections. One deputy, Maryellen Allen, was the "Election Center Co-Director"

7

and she testified there were no uniform, written standards for the review. Instead, the clerks were instructed to eliminate duplicate signatures and signatures of persons not registered in an affected taxing district on the day of the evaluation, referencing the County Clerk's own registration records or the statewide Voter Registration Database. Additionally, the County Clerk did not eliminate signatures that contained abbreviated names or nicknames, misspellings of names or addresses, or so-called errors in birth dates if the day or month was one off or inverted. The County Clerk relied on KRS 116.025(4) and KRS 116.085(3), as well as the case of *Petition Committee v. Board of Education of Johnson County*,[9] for the belief that she had discretion in determining which signatures were compliant with the recall petition statute and that substantial compliance was all that was necessary for a signature to be certified as valid. All parties agree the threshold for proceeding to a regular ballot was 35,517 signatures. On August 10, 2020, the County Clerk certified 38,507 signatures as valid; 36,131 containing no errors, 2,376 containing at least one error, and 1,813 invalid signatures.

The JCBE then filed suit in Jefferson Circuit Court, seeking review of the county clerk's certification pursuant to KRS 132.017(2)(i). The Recall Committee intervened and brought a counterclaim against the JCBE for failure to comply with KRS 133.185 and the notice requirements of KRS 160.470(7)(b). This was the first issue addressed by the lower court upon the Recall Committee's motion for summary judgment. Prior to the May 21, 2020, vote to

---

[9] 509 S.W.3d 58 (Ky. App. 2016).

approve the tax increase, two notices had been published in the *Louisville Courier-Journal* by the JCBE to announce the proposed tax increase as well as other information. The Appellants argue KRS 133.185 requires the Department of Revenue to certify county assessments thus, the JCBE could not publish the compensating general tax rate, revenue expected from it, or revenue expected from new personal and real property—all required by KRS 160.470(7)(b)—prior to certification. This certification did not occur until August 25, 2020. The Appellants further argue that the JCBE erroneously included the wrong tax rate for the 2019 year, thereby not complying with the statute.

The circuit court believed KRS 133.185 and the deadline requirements contained in KRS 132.017 created a practical conflict. Since waiting for the Department of Revenue for certification under the former statute would have precluded the recall vote from proceeding to a regular election ballot in 2020 under the latter statute, the task of applying the statutes harmoniously demanded a determination as to whether the JCBE substantially complied with KRS 133.185. The court found substantial compliance and denied the motion for summary judgment. Later, upon the same basis, the circuit court dismissed the counterclaim.

Finally, a bench trial was held between October 20-23, 2020, regarding the county clerk's certification. The JCBE retained James Sprigler as an expert to conduct an analysis of the signatures certified by the County Clerk. This included the 36,131 certified as without error, as well as a limited review of the 2,376 certified as valid but with error. Sprigler testified of the former category:

9

843 were duplicates, 123 were signatures of a person with no record of being registered in a relevant taxing district, 1,035 had addresses listed on the petition that did not match their address in the County Clerk's registration records, 692 had an address or birth date that did not match the information in the County Clerk's registration records, 859 of the electronic signatures were altered after being submitted to the website but before being included on the petition turned over to the County Clerk, and 75 were handwritten signatures altered after the fact.[10] We must note the failure of the Recall Committee to turn over the original, unaltered electronic data to the County Clerk for purposes of certification is unjustifiable.

All told, had each of these signatures been excluded by the county clerk, only 33,196 signatures would have been valid. Of the 2,376 signatures deemed valid but with an error, Sprigler testified that at least 505 had been certified contrary to the county clerk's own professed standards because the birth date listed either did not merely have the month and day transposed or the birth date was off by more than a single digit.[11]

---

[10] Had the county clerk had the data she could have hired an expert to develop a program and identify these duplicates and erroneous entries in a matter of hours, days at most, with one person rather than the month and twenty deputy clerks it took to do a physical review. When recall petitions utilize electronic signatures that electronic data must be given to county clerks for purposes of certification.

[11] The Appellants argue vigorously against this testimony about the 2,376 valid but with error signatures. We have reviewed the trial record and Mr. Sprigler did testify to this effect and the spreadsheet associated with the testimony was admitted into evidence without objection. Concededly, the trial court did not cite Mr. Sprigler's testimony when it struck those signatures but that is immaterial given our disposition on the matter below.

The circuit court approved Sprigler as an expert witness and concluded "[n]o evidence was presented to indicate that either Mr. Sprigler's software program or the Clerk's voter registration records summary was flawed or inaccurate. The Court thus finds no reason to question the veracity of the data relied upon by Mr. Sprigler in furtherance of his review." Concluding as a matter of law that by listing certain signature requirements in KRS 132.017, the General Assembly expected those requirements to be met, the circuit court struck all 2,376 signatures certified as valid but with errors. Of the remaining, the circuit court struck 843 as duplicates; 123 for having no record of registration; and 934 for having been altered after being submitted to the Recall Committee but prior to being submitted to the county clerk.

The court also made clear that it believed certification was "impossible" even under a substantial compliance standard, noting particularly

> deficiencies involving alleged misconduct and unauthorized altering of signature entries call into legitimate question the veracity of the entire petition. However, perhaps most concerning is the clear attempt of The [Recall] Committee to submit multiple entries for individual citizens. These are not insignificant concerns that can be ignored, and they should not have been.

Thus, the court then dismissed the Recall Committee's counterclaim and ordered "no further action" regarding the regular ballot votes for the tax recall. Because the County Clerk had certified the petition, the question was put on the regular ballot in anticipation of the certification being upheld. As a consequence, absentee and early voting had already been conducted to a limited extent and voters would see the question on the ballot on election day. The circuit court ordered that all votes on the matter should be retained but

11

not tabulated. The Recall Committee and County Clerk then appealed. We granted a motion to transfer the appeal from the Court of Appeals to address the novel issue of the Uniform Electronic Transactions Act[12] (UETA) in the context of elections and ballot access, as well as to clarify the statutory standards involved.

We now address the merits of the appeal.

## II.    Standard of Review

Interpretation of a statute is a question of law thus, reviewed *de novo.*[13] When multiple statutes are at issue, they "are considered to be *in pari materia* when they relate to the same matter with an apparent or actual conflict in some or all of their provisions."[14] "The doctrine is especially applicable to acts passed at the same session of the Legislature, and it is frequently said in the opinions that the acts should be construed together, so as to harmonize and effectuate the purpose of the Legislature in the enactment of both."[15] Where the plain or literal language of a statute leads to a ridiculous or absurd result, we are free to ignore it.[16] "[W]hen the intention of the Legislature is obvious, but the language used, if given its literal meaning, will defeat the intention, the real purpose of the Legislature should be allowed to prevail over the literal import of the words."[17]

---

[12] KRS 369.101 – 369.120
[13] *Daviess Cnty. Pub. Libr. Taxing Dist. v. Boswell,* 185 S.W.3d 651, 656 (Ky. App. 2005).
[14] *Dunlap v. Littell*, 255 S.W. 280, 282 (Ky. 1923).
[15] *Id.*
[16] *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005).
[17] *Hopkins v. Dickens*, 222 S.W. 101, 104 (Ky. 1920).

### III. Analysis

#### A. The UETA, Tax Recall Petition Statute, and Applicable Case Law

The digitalization of social life in recent years presents a daunting challenge to society. Its effects on the law may be comparatively slow but are otherwise limited seemingly only by lack of imagination. Legislatures, courts, and citizens themselves must, in navigating the digital frontier, strive to avoid the outcome whereby individual rights, possessed because of our humanity and membership in political society, become the rights only of technologically-savvy individuals. Equally important is to prevent those who possess the means and ability to do so, from manipulating the laws via technology for their benefit, however sincere or noble, to the detriment of the regular and equal enforcement of the law.

One of the early steps taken by the General Assembly to address developments presented by the advent of digital technology was the Uniform Electronic Transactions Act.[18] It applies "to any electronic record or electronic signature created, generated, sent, communicated, received, or stored on or after August 1, 2000."[19] It formalized the legal status of electronic signatures stating, "An electronic record or electronic signature is attributable to a person if it was the act of the person."[20] Courts are commanded to construe the UETA in a manner that would "facilitate electronic transactions consistent with other applicable law[.]"[21] Moreover, tax recall petitions are commanded to conform to

---

[18] KRS 369.101 – 369.120
[19] KRS 369.104.
[20] KRS 369.109.
[21] KRS 369.106(1).

13

the UETA.[22] Finally, if another applicable law requires a signature to be verified, "the requirement is satisfied if the electronic signature of the person authorized to perform those acts [verification], together with all other information required to be included by other applicable law, is attached to or logically associated with the signature of record."[23] Tax recall petition signatures are unquestionably required to be verified to ensure they belong to "registered and qualified voters residing in the affected jurisdiction . . . ."[24] As such, the electronic signatures were required to be accompanied by the statutorily required information found in KRS 132.017(2)(d)(5), to wit: printed name, street address, social security number or birth date, and the name and number of the voting precinct the signatory resides in.

Significantly, KRS 369.109(1) also provides the following:

> The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.[25]

KRS 369.102 defines "security procedure" as

> a procedure employed for the purpose of verifying that an electronic signature, record, or performance is that of a specific person or for detecting changes or errors in the information in an electronic record. The term includes a procedure that requires the use of algorithms or other codes, identifying words or numbers, encryption or callback or other acknowledgment procedures.[26]

---

[22] KRS 132.017(2)(d)(4).
[23] KRS 369.111.
[24] KRS 132.017(2)(d)(6)(a).
[25] KRS 369.109(1).
[26] KRS 369.102(14).

The commentary to this provision of the UETA makes clear the importance of security procedures in establishing attribution of an electronic signature:

> The inclusion of the specific reference to security procedures as a means of proving attribution is salutary because of the unique importance of security procedures in the electronic environment. In certain processes, a technical and technological security procedure may be the best way to convince a trier of fact that a particular electronic record or signature was that of a particular person. In certain circumstances, the use of a security procedure to establish that the record and related signature came from the person's business might be necessary to overcome a claim that a hacker intervened. The reference to security procedure is not intended to suggest that other forms of proof of attribution should be accorded less persuasive effect. It is also important to recall that the particular strength of a given procedure does not affect the procedure's status as a security procedure, but only affects the weight to be accorded the evidence of the security procedure as tending to establish attribution.[27]

In other words, the use of a security procedure in executing an electronic signature is important because it helps convince a trier of fact that the person signing an electronic document is who they say they are. While KRS 369.109 does not require that a security procedure be used in order for attribution to be established, the specific reference to a security procedure is meaningful.

We address as a matter of first impression what the UETA's requirement that an "electronic signature is attributable to a person if it was the act of the person[,]" means in conjunction with KRS 132.017. But we are convinced "the statute is sufficiently explicit and unambiguous to require its literal

---

[27] Uniform Electronic Transaction Act § 9(a) cmt. at 4 (Nat. Conf. of Comm'rs of Unif. State Laws 1999).

application."[28] An electronic signature is not legally valid when it is not made by the action of the person the signature purports to represent. This must be read in tandem with KRS 132.017(f) which requires county clerks to verify and certify signatures. But electronic signatures are readily subject to fraud, and it is common enough for websites such as retailers, social media, or governments, to ensure a user interacting with their website, making a purchase, or giving an electronic signature is in fact a human who is who he says he is. Here, however, there was no such security measure at all.

There was no requirement that each person electronically signing the petition respond to a callback or acknowledgement email or text message and there was no proof that any other verification procedure was used. Instead, a person signing the electronic petition need only type a name and address, social security number or birth month, and the name and number of their voting precinct. In an electronic environment where generic information such as this is discoverable, such information, alone, is insufficient to establish attribution. Based on the proof, there is simply no way to determine the electronic signatures are attributable to the person they purport to be.

The absence of proof that any security procedure was employed in the process of executing electronic signatures on the recall petition rendered each electronic petition signature invalid under KRS 369.109(1). Because the petition relied on electronic signatures to achieve the threshold number of signatures to place the tax levy before the voters, this reason alone is enough to

---

[28] *Barnard v. Stone*, 933 S.W.2d 394, 396 (Ky. 1996).

declare the petition insufficient as a matter of law. Therefore, the tax levy should not have been certified to be placed before the voters for approval.

## B. Notice of the Tax Levy was Sufficient

The second issue in this case is the Circuit Court's dismissal of the counterclaim against Appellees for failure to comply with statutory notice requirements. In general, strict compliance with statutory notice requirements is the standard and "where the statute required notice of the steps in proceedings for a tax levy, the publication was jurisdictional."[29] The notice requirements of KRS 160.470(7)(b) are *in pari materia* with KRS 132.017.

When "a district board of education propos[es] to levy a general tax rate within the limits of subsection (1) of this section which exceed the compensating tax rate defined in KRS 132.010. . ." it is required to hold a hearing and give notice.[30] The notice must be formatted a particular way, published in the newspaper of widest circulation in the county,[31] and contain several pieces of information, *inter alia*, the general tax rate and revenue of the preceding year;[32] the general tax rate and expected revenue of the current year;[33] the compensating general tax rate and expected revenue;[34] and expected revenue from new property and personal property.[35] The Appellants

---

[29] *Turrell v. Bd. of Ed. of Marshall Cnty.*, 441 S.W.2d 767, 769 (Ky. 1969).
[30] KRS 160.470(7)(a).
[31] KRS 160.470(7)(b).
[32] KRS 160.470(7)(b)(1).
[33] KRS 160.470(7)(b)(2).
[34] KRS 160.470(7)(b)(3).
[35] KRS 160.470(7)(b)(4).

have argued KRS 133.185[36] is also applicable. That statute, however, is of general applicability whereas KRS 160.470 is specific to district school boards and how they may levy taxes; the specific controls.[37]

The trial court concluded strict compliance with the statutes was impossible because KRS 132.017(2)(a)(2) imposes a 50-day period from the time a tax is passed to when it becomes effective in order that a tax recall initiative may have adequate time to be organized and effected.[38] Additionally, if a tax recall is successful in its petition requirements, an election on the tax increase is to be held on the "next regular election[.]"[39] In this case, that was November 3, 2020. Although our statutory analysis differs from the circuit court's, we reach a similar conclusion that between KRS 160.470(7)(b) and KRS 132.017, an impossible condition is imposed precluding application of some notice requirements.

The Appellants admit in their own briefing that the JCBE's notices in May of 2020 could not contain some of the statutorily mandated information under KRS 160.470(7)(b) because it simply was not available at that time. They admit the current year assessment had not been completed and that the Jefferson County PVA would not even begin its inspection period for another

---

[36] "Except as provided in KRS 132.487, no tax rate for any taxing district imposing a levy upon the county assessment shall be determined before the assessment is certified by the Department of Revenue to the county clerk as provided in KRS 133.180."

[37] *Abel v. Austin,* 411 S.W.3d 728, 738 (Ky. 2013). The trial court found KRS 133.185 to be applicable and then considered whether the JCBE was in substantial compliance with it, alongside KRS 132.017. That was incorrect per our analysis.

[38] KRS 132.017(2)(b).

[39] KRS 132.017(3)(a).

four to five weeks. They admit personal property tax returns were not due for another five to six weeks. And they admit the Department of Revenue would not certify the county assessment tax roll until August 25, 2020. Thus, from these facts we see the General Assembly has set out notice requirements for certain tax levy increases, as well as providing a statutory timeline and deadline to challenge such increases in time for the next subsequent regular election; yet, in order to ensure the latter condition, the JCBE was compelled to publish notices before certain information required to be published in them was even available. The Appellants believe that since this information was not available in May of 2020, the JCBE should have waited for availability. We do not agree.

KRS 132.017(3)(a) mandates "[i]f an election is necessary under the provisions of subsection (2) of this section, the local governmental entity *shall cause to be submitted to the voters of the district at the next regular election* the question as to whether the property tax rate shall be levied." (Emphasis added). The JCBE was forced to choose between complying with the deadlines to have the recall issue on the next regular election ballot pursuant to KRS 132.017(2)(a), (2)(b), and (3)(a) and complying with the notice requirements found in KRS 160.470(7)(b). The General Assembly has failed to account for the fact that the information necessary to comply with the latter is not always available in time to comply with the former, inadvertently creating a classic Hobson's choice—comply strictly with the notice requirements but then potentially be forced to wait years before a final determination on a tax increase

19

is made by the voters. The negative effect this would have on budgeting is obvious and we cannot credit the assumption that the General Assembly would be aware of such a significant issue and just ignore it.

The next regular election was to be November 3, 2020, and the JCBE took those steps possible so the vote could be placed on that ballot if necessary. We do not believe the JCBE should be punished for failing to publish information that was unavailable in time for it to otherwise exercise its statutory rights under KRS 132.017. This application is all the more preferable when, as here, the defect in the notice requirements was not ultimately attributable to the Appellees and resulted in no substantive prejudice to the Appellants.

Because it was impossible for the JCBE to include the general tax rate of the previous year required by KRS 160.470(7)(b), the failure to include it is not fatally defective. The statutes simply do not provide for the circumstance of information required to be published in the notice being unavailable in time for a tax recall to proceed to a regular election ballot in the same year the tax is passed. Therefore, the JCBE's good faith effort to provide the latest available information but mistakenly identifying it as the rate from 2019 rather than 2018, cannot amount to a statutory violation. The circuit court's dismissal of the counterclaim is affirmed.

## IV.    Conclusion

We are mindful that some might be concerned this decision would have the effect of preventing the people from exercising their right to vote. But that

right to vote has been granted by the General Assembly with strict conditions as to when it may be exercised. In cases such as this, the public's right to vote on a tax recall is rendered null by the inadequacy of the recall petition occasioned by the alterations and lack of required information. "That the people are denied a direct and immediate vote on this matter results not from what this court wishes or decrees, but from the restrictions enacted by the legislature and from somebody's failure to comply with those restrictions."[40]

We hold the total absence of any security measures to ensure an electronic signature was in fact made by the purported signatory negates the petition. Secondly, due to factors not controllable by the JCBE, it was not possible for the JCBE to adhere to some of the notice requirements of KRS 160.470(7)(b) and remain consistent with KRS 132.017(3)(a)'s mandate that a tax recall vote be placed on the next regular election ballot. The Jefferson Circuit Court is affirmed.

All sitting. All concur.

---

[40] *Fiscal Ct. of Warren Co.*, 485 S.W.2d at 757 (Palmore, J., concurring).

COUNSEL FOR APPELLANT,
BOBBIE HOLSCLAW, JEFFERSON COUNTY CLERK:

Laurence J. Zielke
Janice M. Theriot
Zielke Law Firm, PLLC

COUNSEL FOR APPELLANTS,
TAX RECALL PETITION COMMITTEE MEMBERS:

Patrick F. Graney
The Graney Law Office, PLLC

COUNSEL FOR APPELLEE,
JEFFERSON COUNTY BOARD OF EDUCATION:

Virginia Hamilton Snell
Byron E. Leet
C. Tyson Gorman
Thomas E. Travis
Wyatt, Tarrant & Combs, LLP

COUNSEL FOR APPELLEE,
JEFFERSON COUNTY TEACHERS ASSOCIATION:

David Tachau
Katherine Lacy Crosby
Kristin E. McCall
Tachau Meek PLC

Thomas J. Schulz
Schulz Messex Dermody, PLLC

Don C. Meade
Priddy, Cutler, Naake & Meade PLCC